**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JONATHAN LASH, ) | |
| ) | CASE NO. 1:12-cv-01306 |
| Plaintiff, ) | |
| ) | |
| v. ) | MAGISTRATE JUDGE GREG WHITE |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | **MEMORANDUM OPINION & ORDER** |
| ) | |
| Defendant. ) | |

Plaintiff Jonathan Lash ("Lash") challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Lash's claim for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

**I. Procedural History**

On March 17, 2008, Lash filed an application for POD and DIB alleging a disability

onset date of January 30, 2006. (Tr. 37.) His application was denied both initially and upon reconsideration. Lash timely requested an administrative hearing.

On September 21, 2010, an Administrative Law Judge ("ALJ") held a hearing during which Lash, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 37.) On September 24, 2010, the ALJ found Lash was able to perform his past relevant work and, therefore, was not disabled. (Tr. 45-46.) The ALJ's decision became final when the Appeals Council denied further review.

## II. Evidence

*Personal and Vocational Evidence*

Age fifty-two (52) at the time of his administrative hearing Lash is a "person closely approaching advanced age" under social security regulations. *See* 20 C.F.R. § 404.1563(d). Lash attended two years of college[1] and had past relevant work as an insurance specialist in the medical field and as a medical biller/coder. (Tr. 56, 59-61.)

*Hearing Testimony*

At the hearing, Lash testified as follows:

- His most recent employment was in 2007 when he worked for the Cleveland Clinic Foundation. (Tr. 57.) He suffered a heart attack in 2006 and returned to work in April of 2007 because he received a letter that he would be discharged if he did not. He stopped working four months later. (Tr. 58.)

- He applied for disability in 2006 due to chronic neck pain. He was helped by a group called ALSAP through his employer, the Cleveland Clinic. (Tr. 62.)

- In 2006, he underwent quadruple bypass surgery, which resolved his cardiac issues. Immediately after surgery, he began to experience neck pain. (Tr. 63.)

---

[1] Lash testified that he had been very close to receiving an Associate's Degree before he suffered a heart attack and never finished. (Tr. 57.)

        The neck pain became progressively worse. (Tr. 64.)

- He received a great deal of treatment to address his neck pain, including radio frequency ablation, nerve blocks, physical therapy, acupuncture, and chiropractic care. None of the treatments afforded him relief. He consulted four different neurologists. (Tr. 64.)

- He began treatment with Dr. Conomy, a neurologist, in late 2007. Dr. Conomy speculated that his neck pain stemmed from hyperextension during surgery. (Tr. 64-65.)

- He is right-handed and experiences numbness and a "pins and needles" sensation, which has affected his ability to carry objects and his penmanship. He can safely carry three to four pounds with his right hand. He has some difficulty buttoning a shirt. (Tr. 65-66.)

- He was treated for occipital neuralgia and takes Oxycontin, Percocet, and Valium for it. (Tr. 66-67.)

- He began treatment with Dr. Genotta, a psychologist, in 2007 after he became depressed subsequent to his surgery. A previous psychologist had prescribed Effexor, which helped but was "not great." (Tr. 67-68.)

- He completed a four-week chronic pain rehabilitation program at the Cleveland Clinic. (Tr. 68-69.)

- A permanent implantation of an electrical stimulation unit in his neck was scheduled to occur in October. (Tr. 69.)

- He frequently experiences shooting pain in his neck. On three or four occasions, the pain was so relentless that he went to the ER after experiencing extreme dizziness resulting in difficulty walking and even speaking. (Tr. 70.)

- On a typical day, he takes his children to school and takes his dog to the dog park. He goes for walks anywhere from one to two hours, but goes at a slow pace. He goes to the grocery store daily to shop for that evening's dinner. After picking up his children at school, he helps them with their homework if needed and prepares dinner. (Tr. 70-71.) He dusts and vacuums, but leaves the more difficult work for his children. He occasionally does laundry but does not do any outdoor chores. (Tr. 76.)

- There are five to seven days a month that his symptoms are so severe that he cannot follow the aforementioned schedule. On those days, his pain is agonizing and he spends most of the day in bed or on a recliner. (Tr. 71.) On those days,

- his children, who are all teenagers, take care of themselves, as he is unable to perform any sustained activity. (Tr. 71-72.)

- His depressive order improved over the past few years, but he still experiences some symptoms. (Tr. 72.) His pain and depression has resulted in verbal altercations with people, and he thought those altercations resulted in the end of his marriage. (Tr. 73.) However, he did not believe that depression interfered with his regular daily routine on most days. (Tr. 75.)

- He regularly wears a soft collar neck brace and occasionally wears a hard collar brace when his pain is overwhelming. (Tr. 73.)

- He would rate his typical pain as an eight on a ten-point scale. His pain medications take the edge off the pain, but, at most, reduces the pain level to a seven or a six. (Tr. 74.)

The ALJ posed the following hypothetical to the VE:

[M]ake the following assumptions for a hypothetical individual aged 47, nearly two years of college, past work as both insurance specialist in medical services and a medical biller/coder. Assume any and all functions not mentioned in the hypothetical can be performed and that's both exertional and non-exertional functions. Limited to light work and the following postural movements can be done occasionally but not more than occasionally. Okay so that's bending, kneeling, squatting, crawling, balancing and climbing stairs and ramps. That's all occasional. The individual should never climb ladders or scaffolding. Can do overhead reaching but only occasionally. And finally must avoid concentrated exposure to extremes of heat and cold.

(Tr. 77-78.) The VE testified that such an individual would be capable of performing Lash's past relevant work, as both those jobs were sedentary and do not ordinarily involve frequent postural movements or overhead reaching. (Tr. 78.) In response to a question from Lash's counsel, the VE testified that an individual with moderate limitations in concentration, persistence and pace would have difficulty performing Lash's past relevant work. (Tr. 80.) The VE indicated that such a limitation would probably reduce the jobs available to those that fall in the unskilled or low semi-skilled categories. (Tr. 80-81.) Lash's counsel inquired whether a person with an unskilled or low semi-skilled job could be absent five to seven days a month.

4

(Tr. 81.) The VE responded that such a person would be unemployable without a special accommodation. *Id*.

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[2]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Lash was insured on his alleged disability onset date, January 30, 2006 and remained insured through the date of the ALJ's decision, September 24, 2010. (Tr. 39.) Therefore, in order to be entitled to POD and DIB, Lash must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period

---

[2] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

### IV. Summary of Commissioner's Decision

The ALJ found Lash established medically determinable, severe impairments, due to "status-post coronary artery bypass graft, coronary artery disease, status-post myocardial infarction, and degenerative changes of the cervical spine." (Tr. 39.) However, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 41.) Lash was found capable of performing his past relevant work activities, and was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work. (Tr. 42, 45.) The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Lash is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is

not mentioned, the Court cannot determine if it was discounted or merely overlooked.");

*McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### VI. Analysis

Lash argues that the ALJ erred by failing to give sufficiently clear reasons for rejecting the opinion of his treating physician, John Conomy, M.D. (ECF No. 14 at 12-16.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[3]

---

[3] Pursuant to 20 C.F.R. § 416.927(c), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p).

Lash asserts that the ALJ failed to set forth good reasons for rejecting two assessments given by Dr. Conomy of his functional limitations. (ECF No. 14 at 14-15.) The Commissioner asserts that the ALJ did not reject or ignore Dr. Conomy's opinions, but ascribed them "moderate weight." (ECF No. 15 at 15.)

On August 28, 2010, Dr. Conomy completed a Medical Source Statement concerning Lash's physical capacity. (Tr. 1267-68.) Dr. Conomy opined that Lash could lift/carry ten pounds occasionally and five pounds frequently. (Tr. 1267.) He indicated that Lash's impairments did not affect sitting.[4] (Tr. 1267.) Dr. Conomy did not indicate how many hours Lash could stand/walk in an eight hour day, but did indicate that standing/walking was affected by Lash's impairments. *Id*. Dr. Conomy indicated that Lash could occasionally climb, balance, reach, handle, feel, push/pull, and manipulate, but could never stoop, crouch, kneel, or crawl.

---

Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

[4] Despite his statement that sitting was unaffected and that Lash could sit for eight hours in an eight-hour workday, Dr. Conomy also noted that Lash could sit for one hour without interruption. (Tr. 1267.)

(Tr. 1267-68.)  His ability to be around moving machinery was also affected.  (Tr. 1268.)  Finally, Dr. Conomy opined that Lash needed additional rest during an eight hour workday, and needed an at-will sit/stand option.[5]  *Id*.

On May 4, 2011, Dr. Conomy completed a second Medical Source Statement concerning Lash's physical capacity.  (Tr. 1415-16.)  Lash's ability to lift/carry ten pounds occasionally remained unchanged.  (Tr. 1415.)  Unlike in his previous assessment, Dr. Conomy gave an indication that Lash could stand/walk for four hours in an eight hour workday, though he found his ability to sit was reduced to a total of four hours as well.  *Id*.  Postural limitations changed little, except that Dr. Conomy added an inability to climb or balance.  *Id*.  Dr. Conomy again opined that Lash needed additional rest during an eight hour workday, and needed an at-will sit/stand option.[6]  (Tr. 1416.)  This latter opinion postdates the ALJ's decision.

In his opinion, the ALJ addressed Dr. Conomy's assessments as follows:

> With regard to the opinion evidence, I assign moderate weight to the opinion of the claimant's treating physician, Dr. Conomy.  Dr. Conomy has offered multiple, yet inconsistent opinions as to the claimant's ability to perform work related activities.  For example, in August of 2008, the doctor advised the claimant to merely, "refrain from any strenuous activity or strenuous manipulation of his neck." (Exhibit 18F.)  However, in a June 2009 statement, Dr. Conomy said the claimant was capable of light work," but should not make any forceful head movements. (Exhibit 23F.)  Finally, shortly before the hearing, Dr. Conomy stated the claimant had much more serious limitations in his ability to perform work-related activity.  Specifically, he stated the claimant must be able to sit/stand at will and should rarely/never stoop, crouch, kneel, or crawl.  He also noted the claimant requires additional rest periods throughout the day. (Exhibit 28F.)  Because of these inconsistencies, Dr. Conomy's opinion is rendered less

---

[5] Previously, in June of 2009, Dr. Conomy believed that Lash had moderate limitations in his functional capacity and was capable of light work.  (Tr. 1220.)

[6] These "additional breaks" are above and beyond a morning break, lunch break, and afternoon break.  (Tr. 1416.)

> persuasive. Further, as noted above, the doctor's own reports fail to reveal the
> type of significant objective and laboratory abnormalities one would expect if the
> claimant were disabled.

(Tr. 44.)

The ALJ also gives little weight to two opinions of treating/examining physicians and one treating chiropractor that are all consistent with an inability to engage in work. (Tr. 44.) The ALJ does, however, adopt the opinion of a non-examining physician employed by the State Disability Determination Services rendered in July of 2008 – prior to any of Dr. Conomy's assessments. (Tr. 45.)

The ALJ found that Lash could perform light work, except that he could only *occasionally* bend, kneel, squat, crawl, balance, and climb stairs/ramps. (Tr. 42.) In addition, the RFC indicated that Lash could never climb ladders, ropes or scaffolds, could only occasionally reach overhead, and needed to avoid concentrated exposure to extreme heat and cold. *Id*. The Commissioner asserts that the ALJ gave moderate weight to Dr. Conomy's opinion, which was partially consistent with the RFC assessment. (ECF No. 15 at 15-16.) However, the ALJ, by failing to incorporate all of the restrictions into the RFC, clearly rejected significant, relevant portions of Dr. Conomy's opinion. Specifically, the ALJ rejected the need for additional breaks, and Dr. Conomy's opinion that Lash could *rarely or never* stoop, crouch, kneel, crawl, or balance. The ALJ also rejected Dr. Conomy's opinion for a sit/stand at-will option. Finally, by finding that Lash could perform light work, the ALJ plainly rejected Dr. Conomy's opinion that Lash was limited to four hours of standing/walking. "The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this

11

category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs.... Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling ("SSR") 83-10.

The Commissioner extensively cites the medical records in arguing that Dr. Conomy's assessment is inconsistent with the medical evidence and other substantial evidence of record. (ECF No. 15 at 16-17.) Except for a passing reference to the ALJ's conclusory and unexplained statement that the reports are inconsistent with Dr. Conomy's own records, the Commissioner fails to argue that the ALJ gave good reasons for rejecting significant portions of the August 2008 assessment of Dr. Conomy. Nonetheless, this Court has previously noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Bable v. Astrue*, 2007 U.S. Dist. LEXIS 83635, 27-28 (N.D. Ohio, Oct. 31, 2007) (*citing NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 715, n.1, (2001)); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("We cannot uphold a decision by an administrative agency … if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.") Though the Commissioner may indeed be correct that Dr. Conomy's assessment is not supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence of record, this Court must base its decision on the explanation actually set forth by the ALJ.

12

The ALJ's explanation – that Dr. Conomy's assessments of Lash's limitations were inconsistent with one another – is an insufficient basis for rejecting them. The ALJ cites opinions offered in August of 2008, June of 2009, and finally August of 2010. Each opinion was rendered almost a year apart, and each opinion is progressively more restrictive. The ALJ's rejection based on this lack of consistency is based on the implicit assumption that Lash's impairments remained static. However, one can just as reasonably surmise that Lash's functional limitations gradually deteriorated over time. As such, the ALJ's rejection of Dr. Conomy's opinion based solely on their inconsistency was unreasonable.

In addition, the ALJ's conclusion – that "the doctor's own reports fail to reveal the type of significant objective and laboratory abnormalities one would expect if the claimant were disabled" – fails to explain in any meaningful manner what sort of objective and laboratory abnormalities were missing from Dr. Conomy's reports. ALJs are not trained medical experts and it is well-established that they may not substitute their own opinion for that of a medical professional. *See, e.g., Meece v. Barnhart*, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (*citing McCain v. Dir., Office of Workers' Comp. Programs*, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted)); *Pietrunti v. Director, Office of Workers' Comp. Programs, United States DOL*, 119 F.3d 1035, 1044 (2nd Cir. 1997); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("But judges, including [ALJs] of the Social Security Administration, must be careful not to succumb to the temptation to play doctor.")); *accord Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823-24 (N.D. Ohio 2009) ("Although the ALJ is charged with making credibility determinations, an ALJ 'does not

13

have the expertise to make medical judgments.'"); *Stallworth v. Astrue*, 2009 WL 2271336 at *9 (S.D. Ohio, Feb. 10, 2009) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record.") (*quoting Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000)). Essentially, the ALJ rejected Dr. Conomy's opinion because he expected some sort of corroborating objective or diagnostic evidence, but does not identify what sort of tests or reports were "missing." Moreover, the ALJ does not explain why his own assessment of Dr. Conomy's treatment records is more accurate than that of Dr. Conomy himself. Although the Commissioner attempts to portray this case as one where the ALJ had to choose among a number of functional assessments performed by various medical sources (ECF No. 15 at 15), the only actual medical opinion that contradicted Dr. Conomy's August 2010 assessment was that of a non-treating source rendered more than two years earlier. The Court finds that the ALJ did not sufficiently weigh the evidence of record, but rather relied upon his own non-expert findings as the basis for rejecting relevant parts of Dr. Conomy's opinions.[7]

Finally, the Commissioner asserts that the limitations contained in Dr. Conomy's August 2008 assessment are not inconsistent with the ability to perform sedentary work. (ECF No. 15 at 18.) Therefore, the Commissioner asserts that the ALJ's finding – that Lash could perform his

---

[7] To the extent the ALJ's opinion might be based on a lack of corroboration in Dr. Conomy's treatment notes, as stated in a recent opinion from this Court, the lack of treatment notes supporting a treating physician's opinion does not completely negate an ALJ's duty to adhere to the treating physician rule. *See Hermiller v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 141364 (N.D. Ohio Dec. 8, 2011) ("[U]nder the treating source rule, even if a physician's opinion is not well-supported, and therefore not entitled to controlling weight, the ALJ is not permitted to simply dismiss the opinion... [E]ven if Defendant was correct that these doctors' opinions were not well-supported or were conclusory, this determination would not have obviated the ALJ's obligation to consider their opinions and provide good reasons for the weight he ultimately assigned to their findings.")

past relevant work which was performed at the sedentary level – is supported by substantial evidence. *Id*. Essentially, the Commissioner argues that even if the ALJ erred by finding that Lash could perform light exertional work, the ALJ's rejection of Dr. Conomy's opinion was harmless because he could still perform sedentary work. While the Commissioner is correct that a person who could sit for four hours and stand/walk for four hours could ostensibly perform the standing/walking and sitting requirements of sedentary work, the Commissioner ignores other portions of Dr. Conomy's opinion that require a sit/stand *at-will* option, significant postural limitations, and, perhaps most importantly, the need for additional breaks during an eight-hour day. The Commissioner does not cite any evidence suggesting that a hypothetical person with these limitations could, nevertheless, have performed either Lash's past relevant work or other jobs existing in significant numbers. As such, the Court cannot find that the deficiencies in the ALJ's explanation as to his reasons for rejecting relevant parts of Dr. Conomy's opinion were harmless.[8]

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence. Accordingly, the decision of the Commissioner is VACATED and the case is REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this opinion.

IT IS SO ORDERED.

/s/ Greg White
U.S. Magistrate Judge

Date: March 5, 2013

---

[8] As the Court finds a remand is necessary, Lash's second argument is rendered moot.